IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH A. GIANSANTE,           )
                                 )
       Plaintiff,              )      Civil Action No. 17-1307
                                 )      Magistrate Judge Maureen P. Kelly
           v.                  )
                                 )      Re:  ECF No. 31
PITTSBURGH PUBLIC SCHOOLS,    )
                                 )
       Defendant.           )

## OPINION AND ORDER OF COURT

**KELLY, Magistrate Judge**

Plaintiff Joseph A. Giasante ("Giansante" or "Plaintiff") filed this employment discrimination action against Defendant Pittsburgh Public Schools ("the District"), alleging that the District unlawfully terminated him because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. §§ 951, *et seq.*  ECF No. 1.

Pending before the Court is the District's Motion for Summary Judgment, contending that Plaintiff's claims are time-barred or, alternatively, that a factfinder could not reasonably conclude that the District's reasons for termination are not legitimate, or that discrimination was more likely than not the motivation for his termination.  ECF No. 31.

In conjunction with the Motion for Summary Judgment, the District has filed a Concise State of Material Facts, ECF Nos. 32 and 62, Appendices containing exhibits to the Motion, ECF

Nos. 33 and 61, and a Brief in Support of the Motion for Summary Judgment, ECF No. 34.[1] Giansante has filed a Brief in Opposition to the Motion, ECF Nos. 35 and 59, a Response to Concise Statement of Material Facts, ECF No. 36, a Counter Statement of Facts in Opposition to the Motion for Summary Judgment, ECF Nos. 44 and 58, and various appendices containing exhibits offered in support of Plaintiff's Counter Statement of Facts, ECF Nos. 38, 39, 40, 41, 42, 43, 45, 46, and 47. The District filed a Response to Plaintiff's Counterstatement of Material Facts, ECF Nos. 52 and 64, a Reply Brief, ECF Nos. 53 and 65, and a Supplemental Appendix, ECF Nos. 54 and 63. Giansante filed his Sur-Reply, ECF Nos. 57 and 60. The parties have jointly filed a Stipulation and Joint Statement of Undisputed Facts, ECF No. 30.

After careful consideration of the evidence of record and the parties' positions, and for the reasons that follow, the Motion for Summary Judgment is denied.[2]

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

1.  **Pennsylvania and District Teacher Evaluation Process**

Pursuant to Pennsylvania law, "[t]he only valid causes for termination of a [tenured teacher's] contract … shall be unsatisfactory teaching performance based on two (2) consecutive ratings of the employee's teaching performance that are to include classroom observations, not less than four (4) months apart, in which the employee's teaching performance is rated as unsatisfactory." 24 Pa. Stat. Ann § 11-1122(a). The collective bargaining agreement between the District and the Pittsburgh Federation of Teachers ("the Union") provides that teachers are subject to annual review to determine a year-end performance rating. ECF No. 33-11 at 17; ECF

---

[1] Pursuant to the Court's request, the parties have refiled certain documents reflecting page citations to the ECF record for ease of locating cited documents in the extensive summary judgment record. The Court appreciates the efforts of counsel in this regard.

[2] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment. ECF No. 8.

No. 33-13 at 122-23.  Accordingly, termination of a District teacher for unsatisfactory teaching performance must be based upon two consecutive annual unsatisfactory ratings.

For school years prior to 2013-2014, the Pennsylvania Public School Law required ratings of teacher performance to be conducted in accordance with "an approved rating system which shall give due consideration to personality, preparation, technique, and pupil reaction, in accordance with standards and regulations for such scoring as defined by rating cards to be prepared by the Department of Education …."[3] 24 Pa. Stat. Ann. § 11-1123 (1996, March 29, P.L., No. 16, § 4, imd. effective); ECF No. 62 ¶ 36. Certified supervisors or principals must conduct evaluations and rating determinations, and a district superintendent must approve the issuance of an unsatisfactory rating.  Id.; ECF No. 62 ¶ 35.

The District's teacher evaluation process includes informal observations at the beginning of each school year to determine whether rituals, routines and procedures are in place.  ECF No. 64 ¶ 34.  If problems are observed, formal observations are conducted. Id. ¶ 35.  Formal observations are at least 40 minutes of class time, and can be announced or unannounced.  Once completed, a written post-evaluation conference is scheduled and the observation is included in the teacher's year-end rating.  Id. ¶¶ 30, 35.  After a formal observation, a school principal determines if an Employee Improvement Plan ("EIP") should be implemented.  Id. ¶ 36.  An EIP for a tenured teacher will result in a year end rating of "satisfactory," "unsatisfactory," or "below average" at the end of the school year. Id.  ¶ 38. A teacher assigned to an EIP will be observed at the commencement of the following school year to determine if continuation of an EIP is

---

[3] The Pennsylvania School Code was amended July 1, 2012, for school years beginning 2013-2014, to modify the rating system to permit consideration of student performance in addition to traditional teacher-classroom observation models. The redesigned system allocates 50% of a teacher's rating to student performance based upon a variety of measures at the building level (15%), teacher level (15%), and district-determined measures of student achievement (20%).  24 Pa. Stat. Ann. § 11-1123 (eff. July 1, 2012).

appropriate.  Id.  Upon the issuance of two unsatisfactory ratings after completion of an EIP, the District recommends termination.  At that point, a teacher has the option of resigning or filing a grievance.  As relevant here, upon issuance of a termination recommendation, the teacher is dismissed from his or her teaching position without pay; however, the District continues health benefits until the conclusion of the grievance process, which may include a hearing before the School Board to challenge the recommendation, followed by a final School Board vote for termination.  ECF No. 36 ¶¶ 7-12.

### 2.  Giansante's Employment History with the District through June 2011

The District hired Giansante on August 29, 2005, at the age of 47, to teach math at Westinghouse High School.  ECF No. 33-1 at 5; ECF No. 38-8 at 1.  He experienced difficulties during his tenure at Westinghouse relative to the teacher observation process.  ECF No. 33-2 at 1-9.  Principal Shawn McNeil observed Giansante on October 4, 2010, and reported a classroom environment marked by students not attempting school work, talking out of turn or to each other, and a teacher providing answers to math problems without student engagement or participation. Id. at 4-6.  While Giansante does not recall being subject to an EIP for the remainder of the school year, his employment records show that McNeil's observation resulted in the development of an EIP setting forth expectations for Giansante, as well as a plan for support and assistance from the Mathematics Curriculum Supervisor, the Principal, and an instructional teacher leader.  Id. at 7-9.

Certified observers recorded that Giansante experienced continued difficulty with maintaining an environment conducive to learning. ECF No. 33-2 at 14, 24, 26-28, 33-38. Giansante also received a reprimand for excessive absenteeism of 23 days as of February 21, 2011.  ECF No. 33-2 at 41.  On February 25, 2011, Giansante requested an unpaid leave of

absence for the period March 7, 2011, through May 27, 2011. ECF No. 33-14 at 6. The leave request was approved, and a paid extension of leave was granted through June 14, 2011, with an unpaid leave for the remainder of the school year. Id. at 9. Giansante was provided a satisfactory rating for the 2010-2011school year.

### 3. Giansante's Performance for School Year 2011-2012

At the conclusion of the 2010-2011 school year, Giansante was displaced from his position at Westinghouse. ECF No. 33-7 at 6. Pursuant to District policy, he was eligible for placement in a similar subject matter vacancy and was required to be placed before openings were publicly posted. Id. At the time, Brashear High School ("Brashear") was an underperforming school in the District with 90 percent of students several years behind. ECF No. 64 ¶ 1. In conjunction with a grant, Brashear was designated as a "turnaround school," and a complete re-staffing process was implemented, requiring existing Brashear teachers to reapply for their positions. Id. ¶¶ 1-2.

Half of the 100 teachers at Brashear were re-staffed, and three co-principals were selected as administrators: Angel Washington, John Vater, and Kimberly Safran. ECF No. 33-7 at 6; ECF No. 64 ¶ 8. Washington and Vater conducted all hiring for the 2011-2012 school year; however, in accordance with District policy, and as a result of his displacement from Westinghouse, Giansante was placed at Brashear effective August 16, 2011, without input from either principal. ECF No. 64 ¶¶ 9-10. The Manager of Employee Evaluation incorrectly informed Washington, Vater, and Safran that Giansante received an unsatisfactory rating for the prior school year. ECF No. 33-11 at 5; ECF No. 62 ¶ 46. Giansante believes that his placement under these circumstances led to resentment against him. ECF No. 33-9 at 7.

In accordance with District practice, Giansante's classroom was observed by a math supervisor on September 16, 2011. ECF No. 33-2 at 81-84. The observer noted poor lesson planning and a failure to teach the curriculum as intended, with Giansante providing correct answers without students demonstrating an understanding of the concept behind a particular problem or answer. Id. Co-principal Washington conducted a formal observation of Giansante's class on September 23, 2011, and identified similar concerns. ECF No. 33-2 at 85-92. The parties dispute the accuracy of Washington's conclusions; in particular, Giansante disputes Washington's statement that students were not engaged in the lesson and that Giansante had ineffectively implemented lesson design simply because students were working independently on packets for a 2-period block of time. ECF No. 64 ¶¶ 56-66. Washington recommended that Giansante be placed on an EIP. ECF No. 38-15 at 2; ECF No. 46-2.

As a result of the EIP, Giansante was formally and informally observed throughout the Fall 2011 by various curriculum supervisors and Brashear principals with no record of discernable improvement in performance. ECF Nos. 38-19, 38-22, 38-23, 38-24, 38-27; ECF No. 38-25 at 2. On December 6, 2011, Washington conducted an informal observation and noted that students were talking during a warm-up exercise, and continued to talk and share answers. ECF No. 38-22. Students were texting on phones, and five students entered the room after the bell without evident consequences. During the lesson, most students continued to talk to each other, and one wore headphones without correction. In addition, African American students sat together in two separate groups, apart from other students. Giansante disputes certain of these findings; in particular whether Washington was aware if or how Giansante disciplined the tardy students once the class period ended. See, e.g., ECF No. 64 at 90.

A formal observation of a different period of instruction was conducted by two curriculum supervisors and Washington on December 14, 2011. ECF No. 38-23. This review raised concerns that seating of students was racially segregated and that Giansante exercised poor classroom control and management. The report indicates that despite taking a quiz, many students continued to talk, and several repeatedly asked if they could use their notes to take the quiz, or asked each other for answers. Students entered the room late with no evident consequences; and students expressed frustration with not understanding the material and with the noise level in the room. The observers noted that Giansante failed to gauge student comprehension during review of the quiz, and asked students to shout out answers, which were stated to be correct or incorrect without explanation to aid understanding of the material. Id.

A post-observation conference was conducted to review the findings, and Washington made recommendations for Giansante to work with a math curriculum coach for better lesson design and teaching methodology. Classroom management was also discussed in terms of improving routines and expectations for behavior. Id.

The District provided Giansante assistance with curricular and instructional specialists throughout the fall and winter. ECF No. 38-44. Ms. Lippert, the District's Chief Academic Officer, recommended that the District issue Giansante a mid-year unsatisfactory rating based upon her observation of him in December 2011, and because of the lack of documented progress. ECF No. 46-3 at 28; ECF No. 38-31. The District represents that the decision to issue mid-year evaluations was an effort to comply with state law requirements for a four-month window between teacher evaluations, and yet achieve a grant-related goal to increase the number of highly effective teachers to improve student outcomes. ECF No. 38-31 at 6. The Union successfully challenged interim ratings, including Giansante's mid-year rating, as a violation of

the terms of the collective bargaining agreement that required ratings to be issued annually. ECF No. 38-31 at 3-12. Accordingly, the mid-year rating had no impact upon Giansante's continued employment with the District.

Washington reinstituted Giansante's EIP at the end of January 2012, stating she had "obvious concerns" about his improvement. ECF No. 38-32. The EIP included a statement that Giansante did not meet the requirement of "[d]emonstrat[ing] ethical behavior, emotional maturity and sound judgment." ECF No. 46-3 at 33. While Washington could not recall any examples of the underlying incidents giving rise to this rating at her 2018 deposition, the evidentiary record contains a memorandum issued by Washington to Giansante on February 20, 2012, indicating that these attributes were noted with regard to "the young African American student in your class, your reaction to your interim rating, a memo sent to you regarding not standing at your doorway in between classes (which was an agreed upon school-wide procedure), as well as documentation about meetings for which you have been late." ECF No. 38-35.

Brashear administrators continued to document problems with classroom control including students walking out of his classroom early on March 9, 2012, and students off-task during an observed class on March 30, 2012. ECF No. 38-39; ECF No. 38-42. Supervisors found Giansante continued to demonstrate difficulty with lesson design and rigor, not timely moving beyond a warm-up exercise to reach the curricular goal for the day, and using worksheets that were not returned to students for their review. Id.

On May 24, 2012, Washington prepared and District Superintendent Linda Lane issued Giansante an unsatisfactory rating for the 2011-2012 school year. Washington noted that despite instructional feedback from multiple observers, "there is little evidence of improvement at this time, and concerns about his teaching abilities are present." ECF No. 38-47.

Mr. Giansante continues to have significant difficulty in planning mathematics lessons as they are outlined in the Core Curriculum. His lessons often lack clear objectives, organization, and rigor. Mr. Giansante also struggles with engaging the students in his classroom and maintaining acceptable classroom behavior. Class time often included an inordinate amount of independent work time or class discussions that follow the IRE (initiate, respond, evaluate) talk structure. There routines often result in students opting in and out of learning and often exhibiting off-task behavior. Students in Mr. Giansante's classroom are often confused and lack understanding of important content and standards because of unclear and low-level expectation given by the teacher.

Id.

Giansante contends that much of the observation summaries are inaccurate reflections of teaching performance, and that his rating was not justified. See, e.g., ECF No. 64 at 81-92; ECF No. 38-35 at 15-17. Giansante points to discrepancies in observer notes regarding the purpose of an exercise in class with conclusions reached. For example, on February 3, 2012, Washington's observation notes indicate that the class was highly interactive, and yet her conclusions state that the class was working independently for the majority of the period and so the lesson design lacked rigor. Id. at 17; ECF No. 38-33. Similarly, Giansante argues that Washington adopted or copied conclusions from one formal observation to another, despite changes in lesson content or plan. See, e.g., ECF No. 33-2 at 117; ECF No. 38-20 at 2. Giansante further finds fault with the District's failure to incorporate performance improvements noted by a District Mathematics Specialist, who "repeatedly made positive comments about Giansante's performance." ECF No. 36 at 18; ECF No. 64 at 96-101. The District responds that because the Mathematics Specialist was not a certified observer, state law does not permit reference to his findings in a rating determination. ECF No. 64 at 100. Giansante contends, however, that the Mathematics Specialist's multiple favorable comments reflected improving lesson plans, classroom control,

and curriculum delivery, and raise substantial questions about the credibility of Giansante's 2011-2012 rating.

### 4. Giansante's Performance for the School Year 2012-2013

As the 2012-2013 school year began, Giansante's classroom had an insufficient number of tables and chairs for his largest class, he was not provided his paper allotment, and he did not have a projector screen or a smart board. ECF No. 38-48. These issues were not resolved until mid to late September. Id. Despite these impediments and in accordance with the District evaluation policy, co-principal Safran conducted an informal observation on September 9, 2012. ECF No. 38-50. She found the classroom decorated with 3-4 motivation posters, but no math curricular or instructional décor. Students walked in several minutes late without comment or consequence, and a five-minute warm-up exercise took nearly twenty minutes for students to complete and review. Throughout the class period, students were talking to each other or on cell phones, asked permission to leave, and students did not display an understanding of the material reviewed. Id.

On September 24, 2012, co-principals Vater and Safran conducted a formal observation. ECF No. 39-2. The report states that students were observed off-task, talking to each other and not completing assigned tasks. While Giansante properly incorporated assigned workbooks to deliver curriculum, at the end of the class period students were not able to articulate the object of the lesson. Vater and Safran concluded that the lesson design lacked structure to ensure that the three stages of a lesson were achieved (set-up, explore, discuss and analyze). Id. Classroom rituals and routines were not established to ensure appropriate behavior and participation. Id. Giansante disputes these findings, in part because he observed a different younger teacher fail to use all phases of a lesson with a class of struggling students, and yet that teacher was not viewed

negatively. ECF No. 59 at 18. In addition, Vater admitted he was not present at the beginning of the class and therefore did not know if the set-up phase of the lesson had been completed. Id.

An EIP was completed on October 10, 2012, and additional observations were held on October 31, 2012, November 28, 2012, December 14, 2012, and January 17, 2013. ECF Nos. 39-5, 39-6, 39-10, 39-12. Co-principal Safran was responsible for overseeing Giansante's 2012-2013 EIP. ECF No. 64 ¶ 347 (Response). The observation reports duplicated areas of concern she discussed with Giansante because "[n]o improvement in planning was noted." Id. Classroom control and management issues were noted during each observed lesson, with students not responding or ignoring directions, talking, playing with cell phones, and opting out of the lesson. ECF No. 39-6 at 2-3, 33-3 at 83. On January 30, 2013, Giansante attended an EIP Monitoring Conference with Safran, who informed Giansante that "[n]o improvement in the areas outlined in the EIP has been observed." ECF No. 39-13. Issues with lesson design, implementing curriculum, and classroom management were again noted in February, March, and early May 2013. ECF Nos. 39-18, 39-19, 39-20.

Near the conclusion of the 2012-2013 school year, Safran prepared a Summary and Conclusion indicating that Giansante's performance rating was unsatisfactory:

> Mr. Giansante continues to have significant difficulty in planning mathematics lessons as they are outlines in the Core Curriculum. His lessons often lack clear objectives, organization, and rigor. Mr. Giansante also struggles with engaging the students in his classroom and maintaining acceptable classroom behavior. Class time often included an inordinate amount of unstructured work time or class discussions that follow the IRE (initiate, respond, evaluate) talk structure. These routines often result in students opting in and out of learning and often exhibiting off-task behavior. Students in Mr. Giansante's classroom are often confused and lack understanding of important content and standards because of unclear and low-level expectation given by the teacher.

ECF No. 33-4.

On May 23, 2013, Giansante emailed the District's Chief Academic Officer and Superintendent Lane to address his concerns that the evaluations failed to reflect favorable changes that were shared with him by observers, and otherwise failed to account for each evaluator's lack of familiarity with the curriculum, making it difficult to fairly assess his adherence to stated goals.  ECF No. 39-21.  In addition, Giansante raised the District's failure to consider his 97% score in a Value-Added Model ("VAM") teacher assessment.  Id.  Giansante contended that an unsatisfactory rating is necessarily incompatible with an "exemplary score of 97."  Id.  Giansante had previously asked Safram to include a reference to his VAM scores in his EIP, but this request was denied.  ECF No. 64 ¶ 348.

That same day, Superintendent Lane reviewed Giansante's email, but did not further investigate his complaint regarding the discrepancy between his exemplary VAM score and the unsatisfactory rating recommendation, nor did Lane ask Lippert whether Giansante's criticism had been investigated.  Id. ¶ 351.  Lane signed unsatisfactory rating, and Brashear administrators met with Giansante to present his ratings packet.  ECF No. 64 ¶ 391.  Giansante asked whether he was terminated, and was told that principals "do not make termination decisions."  Id.  Giansante continued to teach through the conclusion of the school year.  ECF No. 54 at 5.

 On June 17, 2013, Giansante met with Jody Buchheit Spolar, the District Chief Human Resources Officer, and Union Representative Hielman.  Spolar explained that the District would recommend that the School Board terminate his employment, and that Giansante had the option of resigning or utilizing the Union grievance process.  ECF No. 64 ¶¶ 392, 393; ECF 33-6 at 4.  Giansante acknowledges that as of June 17, 2013, he was "terminated" by the District but remained "an active employee on leave without pay."  ECF No. 43-11.  He applied for

unemployment benefits, and identified his last day of work as June 17, 2013. ECF No. 36 ¶ 4. His benefits were payable beginning claim week June 29, 2013. Id.

### 5. Administrative Proceedings

On June 24, 2013, the Union commenced the grievance process on Giansante's behalf, and demanded arbitration. ECF No. 33-11. On June 20, 2014, in lieu of arbitration, Giansante requested a hearing before the School Board to contest his termination. ECF No. 33-11 at 1-3. The hearing was held over the course of five days, and on November 24, 2015, the School Board adopted a resolution discharging Giansante. ECF No. 33-12 at 11; ECF No. 33-4 at 23. Giansante appealed the School Board's action to the Pennsylvania Secretary of Education on December 12, 2015. ECF No. 36 ¶ 13. On May 19, 2016, Giansante filed a Charge of Discrimination, cross-filing with both the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging that his termination was the result of age discrimination, and that similarly situated younger employees were treated more favorably. ECF No. 33-4 at 16. The EEOC issued a Dismissal and Notice of Rights on July 21, 2017. His appeal to the Secretary of Education was resolved in favor of the District on September 27, 2017, with an Opinion and Order affirming the School Board's decision to dismiss Giansante "on the grounds of unsatisfactory teacher performance based on two consecutive unsatisfactory ratings for the 2011-2012 and 2012-2013 school years…." ECF 33-4 at 108. Giansante did not appeal the ruling of the Secretary of Education.

### 6. Disparate Impact/Age-Related Evidence

Giansante has testified that by June 17, 2013, he concluded that his termination was due to his age,

[b]ecause I was 54 years old. I was qualified to do my job. The other – the younger teachers were receiving preferential treatment. I was subsequently terminated after being on leave without pay, and the older teachers were the ones who were placed on improvement plans and given unsatisfactory ratings. There was a pattern of the teachers being older who placed on improvement plans and given unsatisfactory ratings.

ECF No. 33-1. In support of his belief that age played a role in his termination, Giansante points to Superintendent Lane's statement that starting with the 2011-2012 school year, the District was reducing staff due to declining enrollment and "a significant budget hold." ECF No. 64 ¶ 380. The Pittsburgh Post-Gazette reported that Lane believed there had been a decrease in student achievement, due to "teachers' uncertainty about their jobs, increased security during the PSSA exams and the lack of funding for interim assessments in the 2011-2012 school year." ECF No. 64 ¶ 379. If he had not been terminated, based upon his seniority, Giansante would have been entitled to a step salary increase of approximately $33,000 in March 2014. Id. ¶ 390.

Giansante points to statistics with regard to the age of teachers who received unsatisfactory ratings as indicia of the disparate impact of the District's teacher terminations during this economically difficult period:

| School Year | Total of Unsatisfactory Ratings | Number of Unsatisfactory Ratings issued to teachers over the age of 40 |
|---|---|---|
| 2011-2012 | 67 | 55 |
| 2012-2013 | 59 | 51 |
| 2013-2014 | 28 | 19 |
| 2014-2015 | 73 | 66 |

EFC No. 38-8 at 1-7. Lane disputes specific awareness of the impact of ratings upon age groups, but acknowledges that across the District, the majority of teachers are over the age of 40. ECF No. 38-1 at 6. In her role as Superintendent, Lane would "look at the distribution age-wise of all of the teachers, not a particular group," because "people ultimately do retire, and so you do try to track average age so you can get prepared when you're losing teachers out to retirement." Id.

The District was aware that the issuance of unsatisfactory ratings typically results in immediate voluntary resignation, as noted in an email sent by a District employee to an area newspaper in September 2015:

> Most teachers who receive an unsatisfactory rating leave. Over the past four years in the school district, 157 teachers have received at least one unsatisfactory rating. Of them, 106 have left, and 51 remain employed by the district. This is all accurate.

> A second consecutive unsatisfactory rating for a tenured teacher triggers the process for dismissal. Of the 44 who received a second unsatisfactory rating, only one continues to teach, the only one to win a binding arbitration hearing. Five others took their cases to binding arbitration and lost, resulting in their being fired by the school board. The others left….

ECF No. 64 ¶ 386.

### 7.  Credibility of the District's Rationale for Termination

Giansante cites a number of inconsistencies and contradictions in the District's proffered reasons for termination of his employment that render the District's stated basis for termination suspect. Apart from disputing the factual basis of most classroom observation summaries, Giansante also points to two observations he attended with Washington of another District math teacher, Mark Sammartino, with the stated goal of demonstrating effective teaching techniques to Giansante. ECF No. 35 at 18, 22-24; ECF No. 64 ¶¶ 144. Sammartino is approximately 10 years younger than Giansante. ECF No. 64 ¶ 387. Giansante states that Sammartino had similar

teaching methods, and also displayed difficulty with student cooperation, tardy students, and adhering to the District's approved lesson design.  Id. ¶¶ 145, 146, 388, 389.  However, neither Washington nor any other District     supervisor appeared to criticize Sammartino or note any deficiencies.  Id.

In addition, Giansante contends that his VAM scores, as well as scores on a Tripod Student Survey, prove that he is a satisfactory teacher.  ECF No. 36 at 105.  Lane has indicated that the Tripod Survey "is a well-designed and validated tool for gathering high quality information about students' classroom experience."  ECF No. 64 ¶ 374.  When Giansante's survey was conducted, the District chose a class with only nine students present.  Id. ¶¶ 375, 376.  Giansante's scores were higher than others at Brashear and in the District.  Id. ¶ 377.  Giansante's VAM scores reflected student achievement and growth were also among the highest in the District; however, these results were not included or referenced in his annual ratings for either 2011-2012 or 2012-2013 school years.  The parties agree that in accordance with Pennsylvania law, the VAM scores were approved for consideration in teacher evaluations and ratings beginning with the 2013-2014 school year.  Id. ¶ 363; ECF No. 36 ¶ 106. Thus, while VAM and Tripod Survey scores were distributed to teachers, they were not statutorily authorized for use in ratings during the 2011-2012 or 2012-2013 school years.  Id. ¶ 108.  Despite these limitations in utilizing the scores, Plaintiff contends the VAM and Tripod Survey are valuable tools and demonstrate that Giansante's unsatisfactory ratings are suspect and lack credibility. ECF No. 59 at 25.

As a result of the District's alleged age discrimination resulting in termination, Giansante seeks to recover compensatory damages, back pay, and attorney's fees.

## II.    STANDARD OF REVIEW

Summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record, viewed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party. McGreevy, 413 F.3d at 363; Simpson v. Kay Jewelers, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (citing Fuentes v. Perskie, 32 F.3d 759, 762 *n*.1 (3d Cir. 1994)), Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). As to materiality, the relevant substantive law identifies which facts are material. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. Further, inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 *n*.12 (3d Cir. 1990).

## III.    DISCUSSION

### A.    Timeliness of Plaintiff's Claim

The ADEA and PHRA make it unlawful for an employer to discharge an employee because of that individual's age, and require that a plaintiff first exhaust specified administrative remedies before suing for violations of either act. 29 U.S.C. § 623; 43 Pa. Stat. Ann. § 955; Hildebrand v. Allegheny County, 757 F.3d 99, 109 (3d Cir. 2014). To that end, the ADEA requires that a charge of discrimination be filed with the EEOC prior to the initiation of a lawsuit in federal court.  29 U.S.C. § 626(d).  In a state such as Pennsylvania that authorizes a state agency to grant or seek relief from discrimination, the EEOC charge must be filed within 300 days after the alleged unlawful employment practice occurs.  29 U.S.C. § 626(d)(1)(B); 633(b); see also Ruehl v. Viacom, Inc., 500 F.3d 375, 383 (3d Cir. 2007) ("In deferral states, such as Pennsylvania, the charge must be filed within 300 days of the allegedly illegal act.") (citation omitted).

In assessing timeliness of a complaint, the Court must look to the date of complained of events or practices, in light of the general rule that "'[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.' Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  A discrete act in itself constitutes a separate actionable unlawful employment practice. Id. at 114, 122 S. Ct.  2061. Discrete acts include, for example, 'termination, failure to promote, denial of transfer, or refusal to hire.'" Mandel v. M&Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013; and see McGuckin v. Brandywine Realty Trust, 185 F. Supp. 3d 600, 610 (E.D. Pa. 2016).  It is well established that the applicable limitations period is measured from the time

"when the employee knew or should have known of the harm inflicted by the adverse employment decision." Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002).

Given the evident lapse of time between Giansante's 2013 recommended dismissal, the 2015 School Board vote, and the date that Giansante filed his EEOC Charge (May 19, 2016), "[t]he threshold inquiry in evaluating the timeliness of [Plaintiff's] claim is to identify the precise unlawful employment practice of which he complains." Id., (citing Del. State Coll. v. Ricks, 449 U.S. 250, 257 (1980)).

In its Motion for Summary Judgment, the District seeks to limit the scope of Giansante's age discrimination claim to the District's evaluation and ratings process as follows:

> The evaluation process culminated and ended in June 2013 with Giansante's receipt of the second unsatisfactory rating and his removal as a teacher for Defendant. There are neither allegations nor circumstances suggesting discriminatory acts beyond Giansante's period of employment at Brashear.

ECF No. 34 at 15.

Giansante opposes the Motion on the basis of timeliness and argues that the District is conflating two discrete events: first, the decision to place Giansante on an unpaid leave of absence after his second unsatisfactory rating; and, second, the decision to terminate him. In terms of timeliness, Giansante "is only pursuing Defendant's decision to terminate him." ECF No. 60 at 3. Because the School Board did not vote to terminate him until November 24, 2015, after a five-day hearing, Giansante contends that the filing of his EEOC Charge on May 19, 2016, was timely. ECF No. 59 at 5-6. Giansante concedes, however, that the issuance of a second unsatisfactory rating and his dismissal without pay in June 2013 are discrete acts that are time barred. The Court agrees and, accordingly, these acts may not give rise to independent discrimination claims. Hyland v. Smyrna School Dist., 608 F. App'x 79, 82 (3d Cir. 2015).

The District argues that the School Board's adoption of a resolution terminating Giansante in November 2015, does not give rise to a second discrete act, because Giansante understood that as of June 2013, he was terminated, and that the basis for the decision was age discrimination. ECF No. 34 at 12. Citing <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250, 257 (1980), and its progeny, the District contends that Giansante's continued designation as an "active employee" with health benefits until the November 2015 School Board vote does not change this result, or give rise to a second claim.

In <u>Ricks</u>, a professor at Delaware State College was formally denied tenure on June 26, 1974, based upon the recommendations of the faculty senate and tenure committee. Pursuant to university policy, Ricks was offered a one-year terminal contract, which expired in June 30, 1975. Ricks filed his discrimination charge with the EEOC on April 28, 1975, and, after the agency issued a "right to sue" letter, Ricks filed suit alleging discrimination in violation of Title VII and 42 U.S.C. § 1981. Upon reversal of the district court's dismissal of plaintiff's claims as untimely, the United States Supreme Court granted review. The Supreme Court held that the limitations period for a discrimination claim arising out the denial of tenure accrued on the day the plaintiff was told he would not receive tenure, despite his continued employment until the end of a "terminal" contract the following year. The Supreme Court found dispositive Rick's failure to allege a discriminatory discharge claim or discriminatory acts that continued until his discharge, or that occurred at the time of his actual termination. Because the only alleged discriminatory act occurred when the tenure decision was made, his continued employment and the delayed effects of the denial of tenure did not extend the limitations period. 449 U.S. at 259, 261.

It was immaterial that the denial of tenure did not manifest itself until the following year when his terminal contract expired.  Rather, "'[t]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.'" Id. at 258 (emphasis in original) (quoting Abramson v. University of Hawaii, 594 F.2d 202, 209 (9th Cir. 1979)).  Accordingly, "[a] decision to terminate made in advance of the date of actual termination is a discriminatory act and the time to file begins to run from when the employee becomes aware of the unlawful decision to terminate." McGuckin, 185 F. Supp. 3d at 610, citing Watson v. Eastman Kodak Co., 235 F.3d 851, 856 (3d Cir. 2000).

In this instance, however, Plaintiff *has* alleged a wrongful discharge claim arising out of the School Board's November 24, 2015, termination vote. The vote inflicted an injury separate and apart from the loss of pay in June 2013, through the cessation of Giansante's health benefits. Further, record evidence establishes that a recommendation to terminate by the Superintendent does not necessarily result in final termination, because the School Board's independent vote is a required step to effectuate termination.  ECF No. 52 ¶¶ 386, 399.  The termination vote did not occur until after a multi-day hearing before the School Board, and thereby required an independent assessment of the reasons for the rating.  Giansante claims that this evaluation process has been engaged, first by the District, and then by the School Board, to reduce labor costs during a budgetary shortfall. This process resulted in the termination of employment of a disproportionate number of teachers in Plaintiff's protected age class who earn substantially more than younger teachers.  ECF No. 60 at 5. In this regard, the fact that the School Board voted to terminate Giansante after a five-day hearing and the presentation of evidence by both Giansante and the District lends credence to the independent participation of the School Board in Giansante's termination.

The above-recognized facts distinguish Giansante's ADEA claim from that presented in Ricks, and in other cases cited by Defendant, each decided prior to Morgan, where the United States Supreme Court recognized that several actionable and discrete discriminatory acts may occur within the scope of employment including, *inter alia*, a wrongful suspension, the denial of training, and a wrongful termination. Morgan, 536 U.S. at 114. Moreover, in presenting a discrimination claim arising from conduct occurring within the statutory limitations period, the Supreme Court unequivocally held that past acts may be presented as background evidence in support of a timely claim. Id. at 113. Giansante's reliance on and reference to the evaluation process and unsatisfactory ratings therefore is permitted to establish that the School Board, after hearing the evidence presented by the District and Giansante, effectuated a termination depriving Plaintiff of his employment because of his age. Accordingly, the District's Motion for Summary Judgment on the basis of timeliness is denied.

**B.    Merits of Plaintiff's Claim**

**1.    ADEA Order of Proof[4]**

In an ADEA suit lacking direct evidence of discrimination, the order of proof mirrors that of a Title VII discrimination action, as described in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009). Plaintiff must first establish a prima facie case of age discrimination by proving the following four basic facts: (i) he is within the protected age group of 40-70; (ii) he was the subject of an adverse employment action; (iii) he was qualified for the position in question; and (iv) younger employees were treated more favorably. Proof of these basic facts raises an inference of

---

[4] The United States Court of Appeals for the Third Circuit has held that "[t]he same analysis used for ADEA is also applied to PHRA claims." Prewitt v. Walgreens Co., 92 F. Supp. 3d 292 n. 4 (E.D. Pa. 2015), citing Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005). Thus, Plaintiff's PHRA claim is subsumed in the Court's discussion of his ADEA claim.

discrimination, which is given the force and effect of a rebuttable presumption. <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).

Once a prima facie case is established, the burden shifts to the employer, who must then articulate a legitimate, non-discriminatory reason for the adverse employment action. <u>Burdine</u>, 450 U.S. at 254; <u>Santiago v. Brooks Range Contract Servs.</u>, 618 F. App'x. 52, 54-55 (3d Cir. 2015). The employer need not persuade the court that it was actually motivated by the proffered reasons, but needs only to raise a factual issue as to whether it discriminated against the plaintiff. <u>Burdine</u>, at 254-55. This burden is satisfied if the employer "simply 'explains what [it] has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" <u>Board of Trustees of Keene State College v. Sweeney</u>, 439 U.S. 24, 25, n.2 (1978). Thus, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." <u>Burdine</u>, 450 U.S. at 257; <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 426 (3d Cir. 2013).

After the employer has met its relatively light burden of articulating a legitimate non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered explanation is pretextual. <u>Id.</u> Plaintiff may meet this burden either directly, by persuading the court that the employer's action was more likely motivated by a discriminatory reason; or indirectly, by showing that the employer's proffered explanation is unworthy of credence. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 804-805.

Throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff. <u>See</u> <u>Burdine</u>, 450 U.S. at 253-256. Plaintiff may meet this burden if his "prima facie case, combined with sufficient evidence to find that the

employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

In this case, for purposes of the instant Motion for Summary Judgment, the District concedes that Giansante has met his burden of establishing a prima facie case of age discrimination, and argues that it had legitimate, non-discriminatory reasons for terminating Giansante's employment. The District contends, however, that Giansante has failed to prove that its reasons for termination were merely a pretext for age discrimination. Upon review, the evidence establishes that Giansante received two unsatisfactory ratings, and thus Defendant has met its "relatively light" burden to proffer legitimate, non-discriminatory reasons for termination. Accordingly, the Court focuses attention on the third prong of the McDonnell-Douglas burden-shifting analysis.

### 2. Plaintiff's Burden to Prove Pretext

At this final stage of the burden shifting analysis, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015). To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

To establish pretext under the first prong of Fuentes, the plaintiff must do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is

wise, shrewd, prudent, or competent." Id. at 765. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[ ] for its action that a reasonable factfinder could rationally find [it] 'unworthy of credence.'" Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)). "If a plaintiff comes forward with evidence that would cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence,' she need not adduce any evidence of discrimination beyond her prima facie case to survive summary judgment." Burton v. Teleflex Inc., 707 F.3d 417, 430 (3d Cir. 2013) (quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 310 (3d Cir. 2012)).

Under the second prong of Fuentes, a plaintiff may establish pretext "by presenting evidence 'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that age was a motivating or determinative factor.'" Willis, 808 F.3d at 645 (quoting Simpson, 142 F.3d at 644-45). This proof may consist of evidence that: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." Id.

### i. Plaintiff's Evidence to Discredit Defendant's Proffered Reasons

Giansante first argues that a factfinder could disbelieve the District's articulated legitimate reason for terminating him because, "the multitude of Defendant's performance observation documentation of Giansante contains factually objective errors and the individuals who created these documents could not support many of the allegations of his unsatisfactory performance." ECF No. 59 at 13.

For this proposition, Giansante points to contradictions and inconsistencies between observation transcripts with conclusions reached by Washington and Safran, including material covered by classes, their failure to note that materials used in class "were directly from the curriculum," the absence of follow-up after each class to determine whether and how Giansante resolved disciplinary issues, lateness, or failure to participate, and the failure to document the interactive participation of students while working through math problems while he circulated and provided assistance. Id. at 15-18. Criticisms relative to requiring students to work independently failed to account for the need for each student to attempt a problem prior to review. Id. Further, records of favorable observations and, most significantly, a VAM score for the years 2010-2011 and 2011-2012, that statistically placed Giansante's performance at the top percentile of teachers throughout the District, were entirely omitted from the review process. While this favorable information was not statutorily authorized for inclusion in his ratings, the VAM scores directly contradict subjective observations relied upon by the District, and thus call into question the basis for each rating. Had the District assessed Giansante's performance one year later, his VAM scores may have precluded an unsatisfactory rating, based upon Pennsylvania's new requirement to include student achievement scores in teacher evaluations. 24 Pa. Stat. Ann. § 11-1123. In addition, Giansante challenges pivotal observers' failure to hold other younger teachers to the standards imposed upon him. ECF No. 35 at 22-24.

In sum, Giansante has compiled a lengthy challenge to each observation, detailing reasons for methodology or contradictions in observer assessments that may permit a factfinder to find the proffered reason for termination unworthy of credence. See, generally, ECF No. 64. Considering the whole record, and viewing the evidence in the light most favorable to Giansante, as we must, these conflicts are sufficient to require the Court to make credibility determinations

and weigh evidence – tasks that properly are left for the fact finder – to assess whether the District's stated reasons for termination were pretextual. Burton v. Teleflex, Inc., 707 F.3d at 429.

### ii. Evidence that Age was a Motivating Factor

A plaintiff seeking to establish pretext sufficient to allow a reasonable jury to believe that an invidious discriminatory reason was more likely than not a "determinative cause of the employer's action" must point to evidence demonstrating at least one of the following: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. Simpson v. Kay Jewelers, 142 F.3d at 645, citing Fuentes, 32 F.3d at 765. See Ansell v. Green Acres Contracting Co., 347 F.3d 515, 521 (3d Cir. 2003), quoting Fuentes, 32 F.3d at 765 ("[a] plaintiff alleging employment discrimination may challenge the employer's proffered explanation by showing 'that the employer treated other, similarly situated persons out of his protected class more favorably...'").

In this case, Giansante contends that there is sufficient evidence of both discrimination against others within the plaintiff's protected age class and evidence that similarly situated younger employees were treated more favorably, to present a jury question as to whether age was a motivating or determinative factor in his termination. ECF No. 35 at 27. The Court agrees.

The record establishes that prior to 2011-2012, Plaintiff had been employed by the District for six years and had not received an unsatisfactory rating. In 2011-2012, enrollment in the District was shrinking and there was a significant budget hold, causing the District to begin necessary staff reductions. ECF No. 64 ¶ 80. This caused teachers to experience uncertainty about their jobs, which contributed to a decrease in student achievement. Id. ¶ 379. That year,

for the first time, the District issued mid-year ratings of teachers, although this effort was reversed in a labor arbitration as a violation of the collective bargaining agreement between the District and the Union. Subsequently, the District issued 67 year-end unsatisfactory ratings, 55 of which were issued to teachers in Giansante's protected age class. The following school year, of the 59 unsatisfactory ratings issued to teachers, 51 were issued to teachers over the age of 40. Id. ¶ 385. The District was aware that the overwhelming majority of recipients who receive an unsatisfactory rating voluntarily resign to avoid a publicly recorded termination. Id. ¶ 386. Giansante also points to the District's obligation under the collective bargaining agreement to increase his salary $33,000 in the following year, based upon his seniority. Id. at ¶ 390.

In terms of competency, Giansante was compared unfavorably to a teacher at least ten years younger, despite sharing similar teaching styles, curricular progression, and difficulties with classroom behavior and management. Id. ¶¶ 144-57. In comparison to the younger educator who was touted as exemplary, Giansante was negatively assessed and issued an unsatisfactory rating. These facts are sufficient to permit a jury to reasonably infer that age was a determinative factor resulting in his termination.

## IV.    CONCLUSION

For the reasons stated herein, the Court concludes that in assessing the record in the light most favorable to Plaintiff as the nonmoving party, Giansante has proffered sufficient evidence to create a genuine issue of material fact concerning whether the District's asserted legitimate grounds for his termination were pretext for discrimination. Therefore, summary judgment is not warranted. Giansante is entitled to present his case to an appropriate factfinder under the framework established in McDonnell Douglas. Accordingly, the District's Motion for Summary Judgment is DENIED. The following Order is entered:

## ORDER

AND NOW, this 10th day of June, 2019, upon consideration of the Motion for Summary Judgment filed on behalf of Defendant Pittsburgh Public School District, ECF No. 31, and the briefs and exhibits filed in support and in opposition thereto, IT IS HEREBY ORDERED that the Motion is DENIED.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if any party wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

BY THE COURT:

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:    All counsel of record by Notice of Electronic Filing